Richard L. Jasperson (#1001034)
WI State Bar No.: 1001034
RICHARD L. JASPERSON, P.A.
E1000 First National Bank Bldg.
332 Minnesota St.
St. Paul, MN 55101
(651)223-5039

Attorney for Plaintiffs

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| JGSA, INC. on behalf of itself and all others similarly situated, | Case No. 05 c 801 |
| Plaintiffs, | |
| v. | CLASS ACTION COMPLAINT |
| VISA U.S.A., INC. and MASTERCARD INTERNATIONAL, INC., | <u>JURY TRIAL DEMANDED</u> |
| Defendants. | |

Plaintiff JGSA, Inc., on behalf of itself and all others similarly situated, alleges for its complaint against Visa USA, Inc. ("Visa") and MasterCard International, Inc. ("MasterCard"), upon knowledge with respect to his own acts and upon information and belief with respect to all other matters, as follows:

## I.

## INTRODUCTION

1. This antitrust class action, asserted on behalf of merchants that accept Visa-branded and MasterCard-branded payment cards, challenges the rules of the Visa and MasterCard associations (together, the "Associations") forbidding merchants from passing along to cardholders a discrete surcharge to account for the fees that the merchant

is forced to pay defendant and its member banks in connection with transactions effected on defendants' payment cards (the "No-Surcharge Rule" or "NSR").

2. As set forth below, the No-Surcharge Rule is anticompetitive. It raises the prices of goods and services for all consumers because merchants, seeking to pass along the costs they incur to process payment transactions on the Associations' network, are forced to increase the prices of goods and services to all of their customers. Under the NSR, merchants are prohibited from assessing the costs of Visa and MasterCard transactions directly upon those consumers who elect to use Visa or MasterCard payment cards. The No-Surcharge Rule thus forces merchants -- and their customers who pay with cash or low cost plastic payment media -- to subsidize all of the benefits received by Visa and MasterCard cardholders, including frequent flier miles, cash-back rewards and other costly perquisites.

3. The No-Surcharge Rule also insulates the defendants from any efficiency-based competitive threat. In the absence of the No-Surcharge Rule, plaintiff and merchants based in some 41 other states would be free to impose a surcharge on plastic payment cards in the amount of the so-called "discount fees" paid to Visa and the other payment networks. In the face of such surcharges, consumers would be free to (and would) migrate away from "expensive" payment media, such as Visa, MasterCard or American Express, and towards less expensive payment cards -- i.e., cards that carry lower "discount fees," and hence lower surcharges. In other words, if merchants were free to impose a surcharge, a network offering payment processing services to merchants at a lower fee would be able to gain market share by attracting cardholders as well as merchants. The No-Surcharge Rule, however, flatly ensures that defendants' monopoly

2

power will <u>never</u> be challenged by a competitor's ability to deliver payment card processing services at a lower cost. The NSR, then, is the ultimate monopoly maintenance device.

4. Finally, in the face of all of these anticompetitive effects -- including (a) inflating the cost of retail goods and services, (b) compelling users of low-cost payment media to subsidize the frequent flier miles and other perquisites enjoyed by users of high-cost payment media, and (c) the flat-out permanent entrenchment of defendant's monopoly position against any efficiency-based threat -- there is simply no procompetitive justification whatsoever for the No-Surcharge Rule.

5. For all of these reasons, the No-Surcharge Rule constitutes an unlawful monopoly maintenance device, in violation of the Sherman Act § 2, and an unreasonable contract in restraint of trade, in violation of the Sherman Act § 1.

## II.

## JURISDICTION AND VENUE

6. Pursuant to section 16 of the Clayton Act, 15 U.S.C. § 26, this action seeks to prevent and restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. In addition, Plaintiff seeks damages pursuant to Section 4 of the Clayton Act, 15 U.S.C. § 15.

7. Venue is proper in this District pursuant to 28 U.S.C. § 1391 and 15 U.S.C. §§ 22 and 26, because the Associations may be found or transact business within this District. Among other things, Visa, MasterCard and their respective member banks market the Associations' payment card processing services to thousands of merchants within this District.

## III.

## THE PARTIES

8. Plaintiff JGSA, Inc. is a Wisconsin corporation with its principal place of business in Kansasville, Wisconsin. Plaintiff transacts business within this District.

9. Defendant Visa is a Delaware corporation. At all relevant times, Visa was a national bankcard association whose members included more than 6,000 banks. Visa's principal place of business is San Francisco, California. Visa transacts business within this District.

10. Defendant MasterCard is a Delaware corporation. At all relevant times, MasterCard was a national bankcard association whose members included more than 6,000 banks. MasterCard's principal place of business is Purchase, New York. Mastercard transacts business within this District.

## IV.

## CLASS ACTION ALLEGATIONS

11. Plaintiff brings this action as a class action under Fed. R. Civ. P. 23(b)(2) to restrain an unlawful practice under Sections 1 and 2 of the Sherman Act, and as a damages class action under Rule 23(b)(3).

12. The class is comprised of all merchants that have accepted Visa and/or Mastercard-branded payment cards during the longest period of time permitted by the applicable statute of limitations (the "Statutory Period") throughout the United States (the "Class"). The Class does not include Visa, Mastercard, and their member banks, their subsidiaries or affiliates.

13. The members of the Class are so numerous that joinder of all members is impracticable. There exist no conflicts of interest as between the named plaintiff and the other Class members.

14. The named plaintiff has retained counsel that is competent and experienced in class action litigation. Plaintiff and his counsel will fairly and adequately represent the interests of the Class.

15. In relevant respect, defendants have acted and continue to act on grounds that are generally applicable to the Class, such that final injunctive relief with respect to the Class as a whole is appropriate.

16. This class action is superior to any other method for the fair and efficient adjudication of this dispute. There will be no extraordinary difficulty in the management of this class action.

17. Throughout the Statutory Period, the Associations have uniformly imposed the No-Surcharge Rule upon all Class members. All Class members have been damaged in precisely the same fashion, by precisely the same conduct. The degree of damages suffered by individual Class members is readily calculable according to an ascertainable formula. For all of these reasons, questions of law and fact will predominantly be common to the Class. Among the questions of law and fact common to the Class are:

   (i) Whether the Associations and their member banks demand from merchants, as a condition of being permitted to accept defendant's branded payment cards, that the merchant may not assess a discrete surcharge to the consumer in the amount of the actual discount fee that the merchant incurs;

   (ii) Whether Visa's and MasterCard's imposition of the No-Surcharge Rule serves to entrench their monopoly position in the marketplace;

(iii) Whether defendants' imposition of the No-Surcharge Rule forces merchants and those consumers who make purchases on relatively low-cost payment media (such as cash or on-line debit cards) to subsidize the perquisites and benefits enjoyed by users of high-cost payment media, including defendant's branded credit and debit cards; and

(iv) Whether the merchant discount rates that members of the Class have been forced to pay for Visa and MasterCard credit and debit card transactions exceed the rates that would prevail in the absence of the No-Surcharge Rule.

## V.

## **FACTUAL BACKGROUND**

18. Visa and MasterCard are associations comprised of member banks. One function of the member banks is to issue credit and debit cards to their customers bearing the Visa or MasterCard logo. In this capacity, they are known as "issuer banks." Another function of the banks is to acquire and service merchant accounts for the Visa and MasterCard networks; in this capacity, they are referred to as "acquirer banks."

19. The acquirer banks contract with merchants using form agreements approved by the Associations. These agreements contain terms that are mandated by the Associations. One such term, mandated by both Associations, is the No-Surcharge Rule. A typical iteration of the NSR directs that the merchant: "shall not impose any surcharge or fee for accepting a [Visa- branded] Card" and further provides that the merchant "shall not establish procedures that discourage, favor or discriminate against the use of any particular [Visa- branded] Card."

6

20. On behalf of Visa or MasterCard, the acquirer banks charge merchants "discount fees" in connection with processing transactions on the Associations' payment networks. The vast bulk of those discount fees -- typically more than 80% -- are comprised of the "interchange fee," which refers to the fees collected by the issuing bank. The remainder of the merchant discount fee is paid to the acquirer bank and to the association itself. The level of interchange fees is centrally set by each Association.

21. The discount fees charged to merchants for transactions effected on various payment card products vary widely. Depending on variables such as industry and annual charge volume, a schedule of the discount fees facing a small merchant might – just for the sake of illustration -- include the following:

| | | |
|---|---|---|
| Visa credit: | 2.50 | % |
| MC credit: | 2.50 | % |
| Visa signature debit: | 1.80 | % |
| MC signature debit: | 1.80 | % |
| Discover Card: | 1.60 | % |
| American Express: | 3.00 | % |
| PIN-based debit: | 0.25 | % |

22. On the foregoing example, then, the small merchant will receive $99.75 when a $100 retail transaction is processed on a PIN-based debit card. By contrast, where that same $100 transaction is processed on a Visa or MasterCard credit card, the merchant in this example will receive only $97.50.

23. The No-Surcharge Rule ensures that both PIN-based debit card users and Visa and MasterCard credit card users will pay the same amount at the point of sale, no matter how much the merchant stands to receive. It ensures that the consumer is indifferent to, and ignorant of, the cost of the payment card she has decided to pull out of

7

her wallet. She does not care if the cost to the merchant of processing the transaction on that card is $2.50 or twenty-five cents.

24. In the absence of the No-Surcharge Rule, by contrast, consumers would have information concerning the cost of each payment medium, and an incentive to switch from more expensive to less expensive payment media. Faced with a schedule of surcharges similar to the above table, consumers will migrate away from expensive payment options, such as defendants' credit cards or American Express payment cards. The result will be competition, in which each Association will be forced to reduce the centrally set price of its services to merchants or lose market share to more efficient rivals. Because of the interchange system, each Association will be able to respond efficiently to the introduction of price-based competition in the market for payment card services, upon abolition of the NSR.

**Anticompetitive Effects of the NSR:**
**Inflation, Forced Subsidies and Monopoly Maintenance**

25. By preventing the merchant from passing its payment card services costs along narrowly, via a discrete surcharge to those customers who actually use the payment service, the NSR has a profound inflationary effect on retail goods and services. It is a matter of fundamental economics that merchants pass along to consumers at least some portion of their payment processing costs. The No-Surcharge Rule ensures that, in order to pay for the defendants' payment processing services, merchants must raise prices to *all* consumers, including cash-payers and those who would otherwise seek to avoid the high cost of credit card processing services. But for the NSR, then, consumer prices would be

8

lower: the price of goods and services would fall, because those prices would no longer be marked up to reflect merchant discount fees.

26. By the same token, the No-Surcharge Rule effectively mandates that consumers paying by cash, check and low-cost plastic payment media (such as PIN-based debit) must subsidize the costly goods and services enjoyed by Visa or MasterCard credit card users, including such perquisites as frequent flier miles, rental car insurance, free gifts, fraud protection and even cash rewards. These costly perquisites are financed by merchant discount fees. The NSR thus ensures that the cost of these benefits will not be internalized by the cardholders who enjoy them. Instead, the NSR ensures that these costly benefits must be financed by merchants and -- to the extent merchants pass along their payment services costs via general price increases -- by all of their customers, including users of low-cost payment media.

27. The forced subsidization of high-cost payment media users creates a vicious circle for merchants and their customers. The more cardholders use high-cost payment media such as Visa or MasterCard credit cards, the more merchants are required to pay in discount fees. The Associations use these fees to finance benefits with which they entice yet more cardholders into their network. This causes the merchant to incur even more of the high discount fees associated with Visa and MasterCard payment cards. And the more merchants are required to pay in discount fees, the more they must raise prices for all consumers. The merchants are not the only big losers in this equation. Consumers paying by cash, check, food stamps, on-line debit card and other relatively lower cost payment media are significantly injured as well.

28.     If the merchant were free to pass along the discount fee *directly* to the card user via a discrete surcharge, the forced subsidy would disappear. The users of high cost payment cards would themselves fund whatever benefits and conveniences they receive from the payment cards they elect to use. Customers who choose to use an expensive payment medium would pay for the privilege. While an affluent shopper who is 200 points shy of a free trip to Hawaii may not balk at an extra two dollars on her check-out ticket, the cash-payer and on-line debit user will be relieved of the obligation to subsidize that particular junket.

29.     But for the NSR, moreover, the discount fees confronting the merchant would themselves be far lower. Faced with the prospect of a $2.50 surcharge for using a Visa credit card, many consumers would shift to cheaper payment media, such as Discover Card (around $1.50 for this $100 ticket) or offline debit (around $1) or online PIN -based debit-cards (approximately 25 cents). Inevitably, the Visa, MasterCard and American Express networks would significantly and swiftly reduce their centrally set interchange rates, as payment card networks compete to offer lower discount rates and retain cardholders.

30.     The NSR serves to entrench the Associations' monopoly position. Indeed, it safeguards the defendants' market dominance against any threat from a competitor who might seek to gain market share by offering credit or debit card payment processing services to merchants at a cheaper price. The NSR mandates that the consumer's determination of which network is used for any particular transaction will not be affected by the costliness or inefficiency of the network services. It is the consumer who chooses upon what network her retail transaction will be processed. But in making this choice,

10

she neither knows nor has reason to care that the defendants' fees may be several times that of a competitive payment mechanism. Accordingly, if tomorrow a new card network were to offer every merchant in the US credit card services for free, that network would gain no market share from the monopolist Associations because the NSR ensures the consumer will have no incentive to use the cheaper network. Indeed, the NSR ensures perversely that consumers will prefer the more costly network, which will shower them with frequent flier miles and other benefits.

31. The NSR thus guarantees Visa that its monopoly position -- and MasterCard that its shared monopoly position -- will not be threatened by a rival who has developed a way to deliver credit and debit card services more efficiently. It ensures that the dominant networks are insulated from efficiency-based competition and are free to extract massive monopoly rents through supra-competitive (indeed, non-competitive) merchant discount fees.

32. All of these anticompetitive effects of the NSR are heightened by the fact that technology now exists to tack the "true" surcharge -- representing the merchant's actual discount fee for the transaction at issue -- onto the check-out ticket at the point of sale automatically, through a swipe of the payment card. Technological innovation in the development of more efficient payment systems is thus also being retarded by the defendant's continued maintenance of the NSR.

33. If U.S. merchants were free to use at the point of sale a card swiper programmed to tack onto the check-out ticket a surcharge reflecting the discount fee imposed by the payment network for the transaction at issue, enough merchants would do so (or credibly threaten to do so) that the discount fees charged to all merchants would

11

drop down to a level no higher than the rate currently charged for such services by the lowest cost comparable provider of such services.

**Rival Networks**

34. In the event that the defendants' NSRs are adjudged illegal and are ordered rescinded in this action, then no major payment card network -- including American Express and Discover Card -- will impose a no-surcharge rule upon merchants. Neither American Express nor Discover includes such a rule in its standard form card acceptance agreements with merchants, but both include a rule that merchants may not "discriminate" against Amex or Discover, or treat their cards any differently than those of Visa, MasterCard or any other network.

35. Upon a judgment or agreement rescinding Visa's NSR, there will be no contractual restraint against merchants imposing surcharges. Nor are there any federal statutory restraints against the imposition of surcharges. Nor, in 41 states plus the District of Columbia, are there any state law restraints of any nature against the imposition of surcharges.

**Surcharge Mark-Ups**

36. The instant action challenges the NSR. Plaintiff does not, however, purport to challenge as anticompetitive any contractual restriction imposed by Visa, MasterCard or their member banks upon the ability of merchants to pass along to consumers a surcharge in an amount materially greater than the actual, applicable discount fee imposed by Visa, MasterCard and their member banks and materially greater than the amount necessary for the merchant efficiently to institute a procompetitive surcharge. Nor does plaintiff in this antitrust action purport to challenge any contractual

12

requirement that Visa, Mastercard or their member banks may impose mandating that surcharge rates must be reasonably posted or published by the retailer, provided such posting does not impede the plaintiff's business.

**Market Definition**

37. General purpose credit card services form the product dimension of a relevant market for antitrust purposes. The geographic dimension of this market is the United States.

38. Debit card services form the product dimension of another relevant market for antitrust purposes. The geographic dimension of this market is the United States.

39. Significant barriers to entry exist in both the credit card services and debit card services markets.

**Damages**

40. In the absence of the NSR, the merchant discount rate for Visa or MasterCard credit card services applicable to any given merchant during the Statutory Period would not have exceeded the baseline competitive rate for such services. The difference between those comparison rates and the rates actually charged by Visa and MasterCard to the merchant during the Class Period are referred to herein as the "Credit Card Rate Differential."

41. In the absence of the NSR, the merchant discount rate for Visa or MasterCard debit card services applicable to any given merchant during the Class Period would not have exceeded the baseline competitive rate for such services. The difference between those comparison rates and the rates actually charged by Visa and MasterCard to

13

the merchant during the Class Period for debit card services shall be referred to as the "Debit Card Rate Differential."

42. Plaintiffs' claims for damages incurred on or before December 31, 2003 have been released as part of the settlement of *Wal-Mart Stores v. Visa USA, Inc.*, 396 F.3d 96, 110 (2d Cir. 2005) (2d Cir. 2005). Conduct occurring after December 31, 2003, however, remains unaffected by the releases in that case and is not precluded from being the subject of the instant action (the "Damages Period").

**FIRST CLAIM FOR RELIEF**
(Against Visa For Violation of Section 2 of The Sherman Act --
Intentional Monopolization of Credit Card Services Market)

43. Plaintiff repeats and realleges each of the foregoing allegations as though fully set forth herein.

44. Defendant Visa has and exercises monopoly power in the general purpose credit card services market.

45. The NSR furthers and protects Visa's monopoly power in this market by ensuring that no competitor can make inroads on Visa's market position by offering cheaper or more efficient credit card services to merchants.

46. The NSR harms the competitive process and thereby harms consumers.

47. Visa's intentional monopolization of the credit card services market harms the competitive process and thereby harms consumers.

48. There exists no procompetitive justification for the NSR.

49. As a direct and foreseeable result of defendant Visa USA's willful maintenance of its monopoly power in the credit card services market by the anticompetitive device of the NSR, plaintiffs have been injured in an amount to be

14

## FOURTH CLAIM FOR RELIEF
(Against Visa and MasterCard For Conspiracy to Monopolize
In Violation of Section 2 of The Sherman Act)

63. Plaintiff repeats and realleges each of the foregoing allegations as though fully set forth herein.

64. Defendants Visa and MasterCard, along with unnamed co-conspirator member banks, have engaged in a single continuing combination and conspiracy to restrain competition in the relevant markets for debit and credit card services, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

65. In furtherance of this continuing combination and conspiracy, the Associations, acting in concert with and through their member banks, have agreed to abide by a single policy of causing the acquirer banks of both Associations -- many of whom are acquirers for both Associations -- to impose the NSR upon the merchants with whom they contract.

66. The direct and foreseeable consequence and object of the conspiracy is to preclude competition in the relevant markets based upon price, to achieve and maintain for the conspirators, as a group, dominion and control over the relevant markets.

67. This conspiracy has caused significant harm to competition in the relevant markets.

WHEREFORE, plaintiff respectfully seeks an Order:

A. Directing that the instant action may be maintained as a Class Action, on behalf of the Class defined above;

B. Declaring that the No Surcharge Rule, as maintained by defendant Visa, is illegal to the extent it precludes members of the Class from passing along a surcharge, at

17

determined at trial, but not less than an amount equal to (i) the Credit Card Rate Differential, multiplied by (ii) the plaintiffs' total charge volume on Visa credit cards during the Damages Period.

## SECOND CLAIM FOR RELIEF
(Against Visa For Violation of Section 2 of The Sherman Act --
Intentional Monopolization of Debit Card Services Market)

50. Plaintiff repeats and realleges each of the foregoing allegations as though fully set forth herein.

51. Defendant Visa has and exercises monopoly power in the debit card services market.

52. The NSR furthers and protects Visa's monopoly power in this market by ensuring that no competitor can make inroads on Visa's market position by offering cheaper or more efficient debit card services to merchants.

53. The NSR harms the competitive process and thereby harms consumers.

54. Visa's intentional monopolization of the debit card services market harms the competitive process and thereby harms consumers.

55. There exists no procompetitive justification for the NSR.

56. As a direct and foreseeable result of defendant Visa USA's willful maintenance of its monopoly power in the debit card services market by the anticompetitive device of the NSR, plaintiffs have been injured in an amount to be determined at trial, but not less than an amount equal to (i) the Debit Card Rate Differential, multiplied by (ii) the plaintiffs' total charge volume on Visa debit cards during the Damages Period.

## THIRD CLAIM FOR RELIEF
(Against Visa and MasterCard For Violation of Section 1 of The Sherman Act)

57. Plaintiff repeats and realleges each of the foregoing allegations as though fully set forth herein.

58. Defendants Visa and MasterCard, singly and jointly, have and exercise market power in the general purpose credit card services market and in the debit card services market.

59. The NSR, imposed upon merchant plaintiffs by Visa and MasterCard through their acquirer banks, represents an unlawful contract in restraint of trade. Among other things, the NSR represents a vertical restraint that has the clear effect of restraining *inter*brand (i.e., horizontal) competition in the markets for credit card and debit card services.

60. The NSR is anticompetitive. Among its anticompetitive effects are the inflationary pressure it exerts on consumer goods and services, the compulsion of subsidies running from users of low cost payment media to users of defendants' high cost payment media, the entrenchment of Visa's and MasterCard's market position and the insulation of Visa and MasterCard from any competitive threat from a rival offering cheaper or more efficient credit or debit card services.

61. There exists no procompetitive justification for the NSR.

62. As a direct and foreseeable result of defendants willful imposition of the NSR, plaintiffs have been injured in an amount to be determined at trial.

a disclosed rate, in the approximate amount of the actual discount fee applicable to the particular transaction at hand;

      C.      Awarding threefold the amount of damages to be proven at trial;

      D.      Awarding attorneys' fees and costs of suit; and

      E.      Granting such other and further relief as this Court may deem just and proper.

Dated: July 26, 2005

Respectfully submitted,

RICHARD L. JASPERSON, P.A.

By: _____
Richard L. Jasperson
WI State Bar No.: 1001034
E1000 First National Bank Bldg.
332 Minnesota St.
St. Paul, MN 55101
(651)223-5039